# Richmond

MAYNARD M. CARLISLE, ET AL. v. WILLIAM J. HASSAN.

March 10, 1958.

Record No. 4834.

Present, All the Justices.

The opinion states the case.

*Frank L. Ball,* for the petitioner.

*William J. Hassan,* for the respondent.

MILLER, J., delivered the opinion of the court.

The constitutionality of Chapter 302, page 353, 1956 Acts of the General Assembly, § 15-354.2, 1956 Supplement Code of 1950,[1] is tested by this litigation.

---

[1] By the first paragraph of § 15-354.2 the referendum permitted must be held in the year 1956, and the act does not appear in the 1956 Replacement Volume 3 of the 1950 Code.

A petition for a writ of mandamus was filed in this court by the Electoral Board of Arlington county, Virginia, hereinafter called the Board, against William J. Hassan, Commonwealth's Attorney of that county. Its object was to require Hassan to certify a voucher under the provisions of § 15-353.1, Code 1950, in payment of a bill presented for services rendered the Board. In his answer to the Board's petition, Hassan asserts that § 15-354.2, 1956 Supplement Code 1950, under which the Board incurred the item of expense violates Article VII, § 115a of the Virginia Constitution.

If that be true, the county is not legally obligated for the item of expense and his refusal to certify the voucher was justified.

Section 15-354.2, 1956 Supplement of the Code, reads:

"§ 15-354.2. (a) In the year nineteen hundred fifty-six there may be in any county which has adopted the county manager form of organization and government provided for in this article a referendum on the following question:

"Shall county bond issues be subject to approval of a majority of the voters who are freeholders (as well as a majority of the voters) of the county voting in the election?

"The provisions of § 15-360.1 shall apply, and the election shall be conducted, the ballots marked, the returns canvassed and the results certified as provided in § 24-141 of the Code of Virginia.

"(b) If a majority of the qualified electors voting in the referendum called and held as hereinabove provided shall vote in favor of requiring approval of county bond issues by a majority of the voters who are freeholders, (as well as a majority of the voters) of the county voting in a bond issue election, thereafter no bonds shall be issued by the county unless approved by a majority of the voters who are freeholders voting and a majority of the total vote cast in an election called or held for the purpose.

"(c) For the purpose of an election on the question of whether bonds of the county shall be issued, the registered qualified voters of the county who are also freeholders in the county on the date of notice of such election shall be determined in the following manner: at least twenty days prior to such election the electoral board shall ascertain and record on an official list the names of such registered qualified voters who are also freeholders in the county and shall publish forthwith such list by posting copies thereof in at least three public places in the county. On such posted copies, notice shall be given of the time and place of a meeting of the board (to be held not

less than seven nor more than ten days before such election) for the purpose of correcting said official list, and at such meeting or any adjournment thereof the board shall make such additions or eliminations or both as ascertained facts shall require. The official list as corrected shall constitute the final and authoritative determination of the qualified registered voters who are also freeholders for such election. The board shall in like manner prepare a list of qualified registered voters who are not freeholders.

"The election officials shall provide separate voting facilities for qualified voters who are also freeholders in the county, and for qualified voters who are not freeholders in the county. The votes thus cast shall be first canvassed separately before being totaled to determine whether a majority of the votes cast approve the bond issue."

Section 115a of the Constitution, adopted in 1928, follows:

"§ 115a. No debt shall be contracted by any county, or by or on behalf of any school board of any county, or by or on behalf of any school district in any county, except in pursuance of authority conferred by the General Assembly by general law; and the General Assembly shall not authorize any county, or any district of any county, or any school board of any county, or any school district in any county, to contract any debt except to meet casual deficits in the revenue, a debt created in anticipation of the collection of the revenue of the said county, board or district for the then current year, or to redeem a previous liability, unless in the general law authorizing the same provision be made for the submission to the qualified voters of the proper county or district, for approval or rejection, by a majority vote of the qualified voters voting in an election, of the question of contracting such debt; and such approval shall be a prerequisite to contracting such debt. No script, certificate or other evidence of county or district indebtedness shall be issued except for such debts as are expressly authorized in this Constitution or by the laws made in pursuance thereof."

The facts are not in dispute. A stipulation entered into between counsel shows that the county of Arlington adopted the county manager form of government provided for in Chapter 12, Article 3, § 15-350, et seq., Code 1950, years ago and has been functioning under that form of government since 1932.

At the general election held in the county on November 6, 1956, the question, "Shall County bond issues be subject to approval of a

majority of the voters who are freeholders (as well as a majority of the voters) of the County voting in the election?", was submitted to the qualified voters of the county, as provided for in § 15-354.2. At that election 17,681 votes were cast in the affirmative and 15,190 were cast in the negative.

The county is preparing to call for bond issue elections for school purposes and general county purposes, and during 1957 the Board undertook to prepare an official list of the voters who are also freeholders in the county. Patricia Lowe, employed by the Board, rendered services on November 12, 13, and 14, 1957, in the preparation of this list. The voucher in question was to pay her for her services, but the Commonwealth's Attorney declined to certify it for payment as provided for by § 15-353.1, Code 1950.

The question presented is whether or not § 15-354.2 violates § 115a of the Constitution because it requires a majority vote of the voting freeholders, as well as a majority of the combined total vote of the freeholders and the otherwise qualified electors voting in the election, to approve a county bond issue before the indebtedness may be imposed upon the county.

The necessary prerequisites or qualifications to exercise the elective franchise to vote for members of the General Assembly and all officers elective by the people are prescribed in Article II, § 18 of the Constitution. That section of the Constitution of 1902, as amended in 1928 in particulars immaterial to the question presented, follows:

"Every citizen of the United States, twenty-one years of age, who has been a resident of the State one year, of the county, city, or town, six months, and of the precinct in which he offers to vote, thirty days next preceding the election in which he offers to vote, has been registered, and has paid his State poll taxes, as hereinafter required, shall be entitled to vote for members of the General Assembly and all officers elective by the people; but removal from one precinct to another, in the same county, city or town shall not deprive any person of his right to vote in the precinct from which he has moved until the expiration of thirty days after such removal.

"The right of citizens to vote shall not be denied or abridged on account of sex." See § 24-17, Code 1950.

The only exception in the Constitution to the right to qualify as a voter and exercise the elective franchise as fixed and prescribed by § 18 is found in Article II, § 30 of the Constitution. That section, which was a part of the Constitution as adopted in 1902, reads:

"§ 30. The General Assembly may prescribe a property qualification not exceeding two hundred and fifty dollars for voters in any county or subdivision thereof, or city or town as a prerequisite for voting in any election for officers, other than the members of the General Assembly, to be wholly elected by the voters of such county or subdivision thereof, or city, or town, such action, if taken, to be had upon the initiative of a representative in the General Assembly of the county, city or town affected; provided, that the General Assembly, in its discretion, may make such exemptions from the operation of said property qualifications as shall not be in conflict with the Constitution of the United States."

Standing alone, § 18 only prescribes the qualifications for voting for officers elective by the people, and the exception provided in § 30 is likewise limited to the qualifications of electors voting for public officers. The meaning of the words "qualified voters," used in § 115a, adopted twenty-six years later and which pertains to elections to determine whether or not a county shall assume long-term indebtedness, must be ascertained.

Little aid in determining what is meant by the words "qualified voters" as used in § 115a, or in solving the problem presented, can be obtained from an examination of provisions of prior Virginia Constitutions pertaining to or fixing the qualifications of voters. This is because the prohibitions or restrictions imposed by the respective constitutions upon the power of the General Assembly to prescribe qualifications other than as set out in the constitutions for the exercise of the elective franchise have varied from time to time in the several constitutions. (See Vol. 7, Thorpe, *American Charters, Constitutions and Organic Laws, 1492-1908*, pp. 3812, *et seq.*)

The history of these provisions may be found in *Willis* v. *Kalmbach*, 109 Va. 475, 64 S. E. 342, cited and relied upon by both petitioner and respondent. There an act of the General Assembly, which undertook to fix the qualifications to vote in a local option election and in doing so modified the qualifications as stated in § 18, was held to be constitutional. Judge Keith, who wrote the majority opinion, also discussed the meaning and significance of § 18 of the Schedule to the Constitution of 1902, which is set out in the margin,[2] but accorded it little, if any, effect. The facts and issue in that case,

[2] "§ 18. In all elections held after this Constitution goes into effect, the qualifications of electors shall be those required by article two of this Constitution." Volume 9, Code 1950, page 563.

are, however, readily distinguishable from those now presented, for the challenged statute dealt with the qualifications to vote in a purely local option election and not in an election expressly ordained, as here, by the Constitution, and held under general law.

Where restrictions are imposed in the Constitution by express language or necessary implication upon the power of the General Assembly, the restrictions may not be ignored, and legislation in contravention thereof is invalid.

"* * * The Legislature, it is true, to a large extent represents the Commonwealth, but it does so in subordination to the Constitution of the State. It can do nothing which that instrument prohibits and, in what is confided to it, must conform in its mode of action to the requirements of the Constitution. If it transcends its power, or if it acts in contravention of the Constitution, its acts are void; * * *." *Ellinger* v. *Commonwealth*, 102 Va. 100, 105, 45 S. E. 807.

Numerous sections in the Constitution of 1902 in which the words "qualified voters" are used are Article V, § 70; Article VI, § 107; Article VII, §§ 110, 111; Article VIII, §§ 118, 119, 120, 121, and 127. (See also Article IX, § 131, before its amendment in 1928.) The repeated use of these words in the basic law compels resort to and the acceptance of the prerequisites to qualify to vote as specified in Article II, § 18, of the Constitution as the criteria by which the connotation and meaning of "qualified voters" shall be determined when applied to elections ordained by the Constitution and provided for by general law.

"The presumption is that the same meaning attaches to a given word or phrase which is repeated in a Constitution, unless the contrary is made to appear, and hence the whole instrument should be examined to ascertain what that meaning is." *Pine* v. *Commonwealth*, 121 Va. 812, 825, 93 S. E. 652.

"The constitution must be viewed and construed as a whole, and every section, phrase and word given effect and harmonized if possible. *Barbour* v. *Grimsley*, 107 Va. 814, 61 S. E. 1135; *Portsmouth* v. *Weiss*, 145 Va. 94, 133 S. E. 781; *Funkhouser* v. *Spahr*, 102 Va. 306, 46 S. E. 378; *Board of Sup'rs* v. *Cox*, 155 Va. 687, 156 S. E. 755." *Dean* v. *Paolicelli*, 194 Va. 219, 226, 72 S. E. 2d 506.

Section 115a, in clear, express, and mandatory language, restricts and forbids the General Assembly from authorizing any county, or district or school board or school district in any county from contracting long-term debt "unless in the *general law* authorizing the

same provision be made for the submission" of that question to the *"qualified voters"* of the county or district as the case may be for their approval or rejection. (Emphasis added.) *Almond* v. *Gilmer*, 188 Va. 1, 49 S. E. 2d 431.

When § 115a was adopted and became a part of the Constitution in 1928, the words "qualified voters" used in that section were undoubtedly intended by its framers to have the same connotation and include the same requisites necessary to qualify as a voter as are prescribed in § 18 and none other.

Yet the Act in question provides that "no bonds shall be issued by the county unless approved by a majority of the voters who are freeholders voting, and a majority of the total vote cast * * *." It thereby creates a new and additional class of voters, *i.e.*, freeholders within the existing class referred to in §§ 18 and 115a of the Constitution as qualified voters. By its terms it gives the new and more limited class, made up exclusively of freeholders, the power to veto or nullify the effect of the majority of the total vote cast if that be in favor of the bond issue. Its ultimate operative effect is to permit the rejection of a bond issue by a majority of the voting freeholders, however limited their number may be, even though a majority of the *qualified voters* participating in the election approve the issuance of the bonds.

An election on the question of whether or not long-term debt, *i.e.*, bond issues, shall be assumed by counties is expressly required by § 115a. That section having also specified that the question shall be submitted to the qualified voters of the county for approval or rejection, there can be no doubt that its framers intended that the question should be submitted to an electorate meeting the qualifications prescribed in § 18. The General Assembly was not at liberty to redefine "qualified voters" and so require approval of the bond issue by a different electorate from that specified in the Constitution, however desirable it might be to do so.

It necessarily follows that § 15-354.2 contravenes the Constitution and is invalid, and the prayer of the petition for a mandamus must be denied.

*Mandamus denied.*